**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION**

| | | |
|---|---|---|
| KEVIN FRANCIS VIG, | ) | No. ED CV 13-410-PLA |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on March 18, 2013, seeking review of the Commissioner's denial of his applications for child's Disability Insurance Benefits and Supplemental Security Income payments. The parties filed Consents to proceed before the undersigned Magistrate Judge on April 4, 2013, and April 6, 2013. Pursuant to the Court's Order, the parties filed a Joint Stipulation on October 1, 2013, that addresses their positions concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## BACKGROUND

Plaintiff was born on June 24, 1991. [Administrative Record ("AR") at 89.]  He has either an eighth-grade, ninth-grade, or eleventh-grade education, and no past relevant work. [Id. at 25, 40, 201.]

On August 10, 2010, plaintiff protectively filed an application for child's insurance benefits. [AR at 13, 165-66.] Plaintiff also protectively filed an application for supplemental security income on August 5, 2010. [Id. at 13, 169-75.]  In both applications, plaintiff alleged disability beginning on June 1, 2008.  [Id. at 13, 165, 169.]  After his applications were denied initially and upon reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  [Id. at 112-13, 117-33.] A hearing was held on February 6, 2012, at which plaintiff appeared with counsel and testified on his own behalf.  [Id. at 31-65.]  A vocational expert and plaintiff's mother also testified.  [Id. at 66-69, 70-88.]  On February 16, 2012, the ALJ determined that plaintiff was not disabled.  [Id. at 13-26.]  On January 12, 2013, the Appeals Council denied plaintiff's request for review.  [Id. at 1-3.]  This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion."  Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257.  When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th

2

1    Cir. 1989).  Where the evidence is susceptible to more than one rational interpretation, the Court

2    must defer to the decision of the Commissioner.  <u>Moncada</u>, 60 F.3d at 523; <u>Andrews v. Shalala</u>,

3    53 F.3d 1035, 1039-40 (9th Cir. 1995); <u>Drouin</u>, 966 F.2d at 1258.

4

5                                              IV.

6                          <u>THE EVALUATION OF DISABILITY</u>

7            Persons are "disabled" for purposes of receiving Social Security benefits if they are unable

8    to engage in any substantial gainful activity owing to a physical or mental impairment that is

9    expected to result in death or which has lasted or is expected to last for a continuous period of at

10   least twelve months.  42 U.S.C. § 423(d)(1)(A); <u>Drouin</u>, 966 F.2d at 1257.

11

12   **A.       THE FIVE-STEP EVALUATION PROCESS**

13           The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing

14   whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; <u>Lester v. Chater</u>, 81 F.3d 821,

15   828 n.5 (9th Cir. 1995, <u>as</u> <u>amended</u> April 9, 1996).  In the first step, the Commissioner must

16   determine whether the claimant is currently engaged in substantial gainful activity; if so, the

17   claimant is not disabled and the claim is denied.  <u>Id.</u>  If the claimant is not currently engaged in

18   substantial gainful activity, the second step requires the Commissioner to determine whether the

19   claimant has a "severe" impairment or combination of impairments significantly limiting his ability

20   to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  <u>Id.</u>

21   If the claimant has a "severe" impairment or combination of impairments, the third step requires

22   the Commissioner to determine whether the impairment or combination of impairments meets or

23   equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404,

24   Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  <u>Id.</u>

25   If the claimant's impairment or combination of impairments does not meet or equal an impairment

26   in the Listing, the fourth step requires the Commissioner to determine whether the claimant has

27   sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled

28   and the claim is denied.  <u>Id.</u>  The claimant has the burden of proving that he is unable to perform

1    past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie

2    case of disability is established.  The Commissioner then bears the burden of establishing that

3    the claimant is not disabled, because he can perform other substantial gainful work available in

4    the national economy.  The determination of this issue comprises the fifth and final step in the

5    sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966

6    F.2d at 1257.

7

8    **B.     THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

9           In this case, at step one, the ALJ found that plaintiff had not engaged in any substantial

10   gainful activity since June 1, 2008, the alleged onset date.  [AR at 15.]  At step two, the ALJ

11   concluded that plaintiff has the severe impairments of asthma, bipolar disorder, learning disability,

12   and attention-deficit (ADHD).  [Id.]  At step three, the ALJ determined that plaintiff's impairments

13   do not meet or equal any of the impairments in the Listing.  [Id. at 16.]  The ALJ further found that

14   plaintiff retained the residual functional capacity ("RFC")[1] to perform medium work.[2]  [Id. at 18.]

15   Specifically, he found that plaintiff

16          [can] lift and/or carry 50 pounds occasionally and 25 pounds frequently; he can
             stand and/or walk for six hours out of an eight-hour workday with customary breaks;
17          he can sit for six hours out of an eight-hour workday with customary breaks; he is
             unlimited with respect to pushing and/or pulling, other than as indicated for lifting
18          and/or carrying; [plaintiff] should avoid pulmonary irritants such as dust, odors, and
             gases; he should also avoid working in extreme temperatures; [plaintiff] should avoid
19          concentrated exposure to unprotected heights, moving machinery, and other
             hazards; and [plaintiff] is limited to simple, routine, repetitive tasks in a nonpublic
20          setting and with only occasional interaction with coworkers and supervisors.

21   [Id.]  At step four, the ALJ concluded that plaintiff has no past relevant work.  [Id. at 25.]  At step

22   five, the ALJ found, based on plaintiff's vocational factors and the vocational expert's testimony,

23   that "there are jobs that exist in significant numbers in the national economy that [plaintiff] can

24   _____

25          [1]   RFC is what a claimant can still do despite existing exertional and nonexertional
26   limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

27          [2]   Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or
     carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that
28   he or she can also do sedentary and light work."  20 C.F.R. § 416.967(c).

1    perform." [Id.]  Accordingly, the ALJ determined that plaintiff has not been under a disability since

2    June 1, 2008.  [Id. at 26.]

3

4                                              **V.**

5                               **THE ALJ'S DECISION**

6          Plaintiff contends that the ALJ failed to properly consider his subjective symptom testimony.

7    [Joint Stipulation ("JS") at 3-8.]  Plaintiff also argues that the ALJ failed to properly consider the

8    lay witness testimony of plaintiff's parents.  [Id. at 3, 9-12.]  As set forth below, the Court concludes

9    that the ALJ's rejection of plaintiff's and plaintiff's parents' subjective allegations is supported by

10   substantial evidence, and affirms the ALJ's decision.

11

12   **A.      CREDIBILITY**

13         "To determine whether a claimant's testimony regarding subjective pain or symptoms is

14   credible, an ALJ must engage in a two-step analysis."  Lingenfelter v. Astrue, 504 F.3d 1028,

15   1035-36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented

16   objective medical evidence of an underlying impairment 'which could reasonably be expected to

17   produce the pain or other symptoms alleged.'"  Id. (quoting Bunnell v. Sullivan, 947 F.2d 341, 344

18   (9th Cir. 1991) (en banc)).  Second, if the claimant meets the first test, the ALJ may only reject the

19   claimant's testimony about the severity of his symptoms upon (1) finding evidence affirmatively

20   suggesting that the claimant was malingering, or (2) offering specific, clear and convincing reasons

21   for doing so.  See Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993); see also Lingenfelter, 504

22   F.3d at 1036; Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003).  The factors to be

23   considered in weighing a claimant's credibility include: (1) the claimant's reputation for

24   truthfulness; (2) inconsistencies either in the claimant's testimony or between the claimant's

25   testimony and his conduct; (3) the claimant's daily activities; (4) the claimant's work record; and

26   (5) testimony from physicians and third parties concerning the nature, severity, and effect of the

27   symptoms of which the claimant complains.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th

28   Cir. 2002); see also 20 C.F.R. §§ 404.1529(c), 416.929(c).  If properly supported, the ALJ's

1  credibility determination is entitled to "great deference." See Green v. Heckler, 803 F.2d 528, 532

2  (9th Cir. 1986).

3         In an Adult Function Report dated October 4, 2010, completed by plaintiff and plaintiff's

4  mother [AR at 216-23], plaintiff stated that he can perform household tasks to the extent that he

5  "can feed [him]self," and "clean [his] clothes," but laundry takes him "all day," and he does it only

6  once a month. [Id. at 217-18.] Plaintiff also indicated that he "feel[s he has] to look nice," that he

7  "take[s] a shower when [he] feel[s] like [he is] dirty about four or five times a day," and shaves two

8  times a day. [Id. at 217.] Plaintiff described his daily routine as waking up, showering multiple

9  times, using the computer, getting dressed, and watching television with his father. [Id. at 216.]

10  When asked if he prepares his own meals, plaintiff stated that he does not, but that he "can make

11  sandwiches," although it takes him fifteen or twenty minutes to make one. [Id. at 218.] Plaintiff

12  stated that he does not do house or yard work "[b]ecause [his] hand was broke[n] [three] times[.]

13  I'm in pain with my hand." [Id. at 219.] Plaintiff also indicated that he does not go out "all the time

14  because people are out to get me," and he cannot go out alone because "[p]eople don't like me

15  if I'm going somewhere I need someone with me." [Id. at 219.] Plaintiff further explained that he

16  shops "once a month with someone with [him] and [he] only stay[s] in stores about [ten] to [fifteen]

17  min[utes]." [Id. at 219.] Plaintiff explained that his hobbies and interests include watching

18  television, although he doesn't understand what is being said; playing video games; being alone

19  in his room listening to music; and using the computer all day. [Id. at 220.] Plaintiff indicated that

20  he spends most of his time with his parents and does not have any friends. [Id.]

21         As to his abilities, plaintiff represented that his symptoms affect his ability to walk,

22  remember, complete tasks, concentrate, understand, follow instructions, and get along with others.

23  [AR at 221.] He indicated that he has "difficulty walking long distances due to asthma," which

24  limits him to walking "about [twenty minutes]" before he "can[']t get air." [Id.] With regard to his

25  memory, he stated, "I can get a glass out to get a drink and forget [where I] put the glass. If I start

26  something I don[']t finish my mind won[']t let me think. I don[']t understand people when they talk

27  to me." [Id.] When asked if he can follow spoken instructions, plaintiff stated, "It['s] hard I

28  sometime[s] don[']t understand what they want me to do." [Id.] Regarding authority figures,

1  plaintiff stated, "I don[']t talk to them," and when asked how he handles stress, he responded, "[I

2  d]o not handle stress I get mad and cut myself or hurt myself." [Id. at 222.]

3       In a December 12, 2010, Adult Asthma Questionnaire [AR at 224-25], completed by

4  plaintiff's mother on his behalf, plaintiff stated that he has asthma attacks "[e]very day." [Id. at

5  224.] He also explained that he does not have medication "because I have no insurance I lost it

6  when I turned [eighteen]. I[']m suppose[d] to use [an] inhaler every day." [Id.] Plaintiff stated that

7  he has not been to the emergency room "[since he] turned [eighteen]" for an asthma attack and

8  he has never been hospitalized for asthma. [Id. at 225.]

9       At the administrative hearing, plaintiff testified that he has never worked and has attempted

10  to apply for work only once. [AR at 40-41.] Plaintiff further testified that he left school during the

11  ninth grade and currently lives with his parents. [Id.] Plaintiff stated that he can only read and

12  write very simple words, that he needs to be reminded to take his medications, and that he is

13  unable to work because he cannot "focus on people and how they . . . explain things." [Id. at 42-

14  43, 64.] When asked whether he can do any household chores, plaintiff said, "My mom does all

15  the chores. I try and help but I just feel like a lazy person that can't do nothing." [Id. at 51.]

16  Plaintiff also explained that he experiences chest pain that he attributes to heart problems or

17  stress. [Id. at 47.] Plaintiff testified that he suffers from asthma, but also said he hadn't "had [an]

18  asthma attack] in a while," and that he does not take medication for asthma. [Id. at 57.] Referring

19  to a fire that occurred in his bedroom when a heater ignited the sheets on his bed, he stated,"I did

20  get an asthma attack when I was in the fire." [Id. at 49, 57.] Plaintiff admitted that he smokes

21  cigarettes once a month and marijuana "[j]ust about every day." [Id. at 49, 54.] In particular,

22  plaintiff stated, "I use [marijuana] for my pain and it makes me like think more. Where I'm not like

23  so hyper and all over the place." [Id. at 54.] Plaintiff also testified that he has pain in his right

24  hand stemming from three occasions on which he broke his hand, including from hitting a wall.

25  [Id. at 63.] Specifically, plaintiff explained that he "get[s] pains" in his hand, but that the pain

26  "doesn't really [impact his ability to write] that much but it hurts when [he makes] hand figures and

27  stuff." [Id. 44, 63-64.] In addition, plaintiff testified that he has cut himself on several occasions,

28  sometimes because he heard voices instructing him to do so. [Id. at 61-62.] Plaintiff indicated that

7

he takes his medications, including an anti-depressant, as prescribed, and that they help to "take[]
all the bad thoughts away and I just like feel like relaxed." [Id. at 46.] Plaintiff went on to explain
that the "bad thoughts" involved "cutting myself and anxiety attacks.  I feel like I'll have a heart
attack or something." [Id. at 46-47.] According to plaintiff, he plays two video games, "Black Ops"
and "Call of Duty," "[e]very day," "all night," and he can play one game "for like five hours at least."
[Id. at 47, 49-50.] Plaintiff also stated that he has a friend who comes over to play video games
with him. [Id. at 50.] Plaintiff explained that he played football in school and gets along well with
others, but that he no longer exercises or works out because he "[j]ust got lazy." [Id. at 53.]
Finally, plaintiff advised that he cannot go outside because he is afraid of being attacked and he
has not left home alone in the past "couple [of] years." [Id. at 52, 62-63.]

In her decision, at step one of the two-step credibility analysis, the ALJ found that plaintiff's
"medically determinable impairments could reasonably be expected to cause *some* of the alleged
symptoms . . . ." [AR at 21 (emphasis added).]   The ALJ then concluded that plaintiff's
"statements concerning the intensity, persistence and limiting effects of these symptoms are not
credible to the extent those statements are inconsistent with the [ALJ's RFC findings for plaintiff]."
[Id.]  Specifically, the ALJ rejected plaintiff's subjective allegations on the grounds that: (1)
"[plaintiff's] asthma condition is not as limiting as he has alleged[;]" (2) plaintiff's activities of daily
living "are not limited to the extent one would expect, given the complaints of disabling symptoms
and limitations[;]" and (3) even accounting for plaintiff's "one to two episodes of decompensation
where he was admitted to inpatient psychiatric care," these episodes "were largely due to
[plaintiff's] noncompliance with, or lack of, medications, which he admitted were effective in
controlling his behavioral problems[,]" and the exacerbation of his psychiatric symptoms was
associated with plaintiff's "history of illegal substance abuse." [Id. at 20.]

The ALJ's rejection of plaintiff's subjective allegations is supported by substantial evidence.
As an initial matter, the Court notes that although the record contains some evidence of

1  malingering,[3] the ALJ explicitly gave that evidence little weight because "the examiner spent a very

2  limited amount of time with [plaintiff] and did not adequately consider [plaintiff]'s longitudinal

3  records or his subjective complaints.  Further, he did not have the opportunity to review the

4  longitudinal treatment record and the evidence submitted after the evaluation."  [AR at 24.]  As a

5  result, the ALJ was required to offer "specific, clear and convincing reasons" for rejecting plaintiff's

6  subjective symptom testimony.  See Lingenfelter, 504 F.3d at 1036.

7      Here, the ALJ rejected plaintiff's allegations that he has daily asthma attacks, has to use

8  an inhaler and has difficulty walking due to his asthma because plaintiff "admit[ted] he uses no

9  asthma medications and has not had an asthma attack since he turned 18."[4]  [AR at 20, 225.]

10 Plaintiff "also disclose[d] that he smokes cigarettes and medical marijuana for the pain in his hand.

11 The foregoing indicates that the [plaintiff]'s asthma condition is not as limiting as he has alleged."

12 [Id.]  Plaintiff's inconsistent statements regarding the limiting effects of his asthma constituted a

13 clear and convincing reason for the ALJ to reject his subjective allegations.  See Verduzco v.

14 Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999) (finding that plaintiff's inconsistent testimony regarding

15 his symptoms constituted a clear and convincing reason for rejecting his subjective allegations);

16 Fair v. Bowen, 885 F.2d 597, 603-04 (9th Cir. 1995) (discrepancies in a plaintiff's statements or

17 exaggerated complaints are valid grounds to reject credibility).

18     The ALJ also rejected plaintiff's credibility on the ground that his daily activities "are not

19 limited to the extent one would expect, given the complaints of disabling symptoms and

20 limitations."  [AR at 20.]  Specifically, the ALJ noted that plaintiff "has no difficulty with personal

21

22 _____

23 [3]  On January 13, 2011, examining physician Dr. Harrell Reznick performed a mental health
   evaluation of plaintiff and opined that plaintiff "presented with what appeared to be a sub-optimal
24 effort throughout [the] evaluation, resulting in test performances that seem to underestimate his
   actual levels of functioning."  [AR at 517.]  Dr. Reznick also conducted a test of memory
25 malingering that indicated "an extremely high probability of malingering."  [Id. at 522.]

26 [4]  Plaintiff turned 18 approximately 18 months prior to completing the 2010 Adult Asthma
   Questionnaire [AR at 225], and there is no evidence that he suffered any asthma attacks between
27 that time and the date of the hearing, with the exception of one, which was the result of smoke
   from a fire in his bedroom.  [Id. at 49, 57.] Thus, the asthma attack free period (with one exception)
28 amounts to two-and-one-half years.

hygiene and helping his mom with household chores. . . . [and] he admits to playing complex video games such as 'Call of Duty' and 'Black Ops' on a daily basis for up to five hours per day," despite alleging "ADHD and a learning disability that affects his memory and concentration." [Id.] The ALJ also found that while plaintiff asserts that "he does not like being around others" and does not go out alone, he acknowledges that he gets along with family, plays video games with a friend, visits family during the holidays, and has no difficulty attending doctor appointments. [Id.] The ALJ properly found that plaintiff's admitted daily activities were inconsistent with his claim that he was completely unable to work. See Curry v. Sullivan, 925 F.2d 1127, 1130 (9th Cir. 1991) (finding that a plaintiff's ability to take care of her personal needs, prepare easy meals, do light housework, and shop for groceries is inconsistent with an inability to do all work activity).

Additionally, the ALJ found that "[e]ven if [plaintiff]'s daily activities are truly as limited as alleged," those limitations are "self-imposed or imposed on him by family members, and not due to any established impairment, as [plaintiff] indicates in his testimony that he is largely dependent on his mother to do things for him[]" and admitted he does not do chores "because he is lazy[.]" [AR at 20.] "A claimant's limitation which is self-imposed rather than a medical necessity is a basis on which an ALJ may discredit a claimant's alleged limitation." Stone v. Astrue, 804 F.Supp. 2d 975, 986 (D.Ariz. 2011) (citing Blakeman v. Astrue, 509 F.3d 878, 882 (8th Cir. 2007)); see Connett v. Barnhart, 340 F.3d 871, 873-74 (9th Cir. 2003) (holding that ALJ did not err in discounting claimant's testimony about her "functional restrictions," because the ALJ determined that the restrictions were self-imposed).

Finally, the ALJ noted that although plaintiff experienced one or two episodes of decompensation requiring inpatient psychiatric care, "these episodes were largely due to his noncompliance with, or lack of, medications, which he admitted were effective in controlling his behavioral problems. . . .   The record reflects significantly improved mental status examinations in the latter part of 2009 and in 2010 when [plaintiff] was compliant with medications."[5] [AR at 20,

---

[5]   The ALJ additionally noted that plaintiff's "history of illegal substance abuse has also contributed to the exacerbation of psychiatric symptoms." [AR at 20, 375-417.]

1   316-25; see also id. at 46 (plaintiff admitting that when he takes medication as prescribed it helps

2   relieve his symptoms).]  An ALJ may properly rely on "unexplained or inadequately explained"

3   failure to follow a prescribed course of treatment to discredit a plaintiff's subjective symptom

4   testimony.  See Tommasetti v. Astrue, 533 F.3d 1036, 1039 (9th Cir. 2008) (finding permissible

5   the inference that plaintiff's pain was "not as all-disabling as he reported in light of the fact that he

6   did not seek an aggressive treatment program and did not seek an alternative or more-tailored

7   treatment program after he stopped taking an effective medication due to mild side effects").

8          In sum, because the ALJ provided clear and convincing reasons to discount plaintiff's

9   allegations of his subjective symptoms, her credibility determination must be upheld.

10

11  **B.     LAY WITNESS TESTIMONY**

12          An ALJ may consider lay witness testimony to determine the severity of a claimant's

13  impairments and how the impairments affect his ability to work.  Stout v. Comm'r, Soc. Sec.

14  Admin., 454 F.3d 1050, 1053 (9th Cir. 2006); Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir.

15  1996); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Lay witnesses include spouses,

16  parents and other care givers, siblings, other relatives, friends, neighbors, and clergy.  20 C.F.R.

17  §§ 404.1513(d)(4), 416.913(d)(4).  Thus, lay witness testimony by friends and family members

18  who have the opportunity to observe a claimant on a daily basis "constitutes qualified evidence"

19  that the ALJ must consider.  See Sprague v. Bowen, 812 F.2d 1226, 1231-32 (9th Cir. 1987);

20  Smolen, 80 F.3d at 1289 (testimony from lay witnesses, who see the plaintiff on a daily basis

21  and are often family members, is of particular value); Dodrill, 12 F.3d at 919 ("[a]n eyewitness

22  can often tell whether someone is suffering or merely malingering ... this is particularly true of

23  witnesses who view the claimant on a daily basis.").  The ALJ may discount the testimony of lay

24  witnesses only for "reasons that are germane to each witness."   Dodrill, 12 F.3d at 919;

25  Regennitter v. Comm'r of Soc. Sec. Admin., 166 F.3d 1294, 1298 (9th Cir. 1999).

26          At the administrative hearing, plaintiff's mother testified that plaintiff did not smoke

27  marijuana daily, but instead that "it's like every other day."  [AR at 83.]  When asked about

28  plaintiff's positive test result for methamphetamine use in 2009 and his statement to a medical

1    professional that he had used methamphetamine "since he was a kid" [Id. at 422], plaintiff's
2    mother denied that he ever used methamphetamine other than as prescribed three years earlier
3    in ADHD medication, and asserted that she believed plaintiff's ADHD medication caused the
4    positive test result.  [Id. at 83-84.]  She also stated that she did not think plaintiff would have any
5    way of getting methamphetamine, because "[h]e doesn't know anybody."  [Id. at 84.]  She testified
6    that plaintiff never goes out by himself and that she gives plaintiff his medications because he
7    cannot remember whether he took them.  [Id. at 78-79.]  She also stated that plaintiff has "very
8    explosive" mood swings "every day," and that "he [is] very violent."  [Id. at 82-83.]  She explained
9    that plaintiff was placed in a special education "containment class" in school because of his
10   "learning problems," as well as his ADHD and violent behavior.  [Id. at 80.]  Finally, she testified
11   that he used to attack and hit her, "but he's not quite as bad [now] because he's not a child
12   anymore," although she also said, "[h]e's not better."  [Id. at 81.]

13        On October 4, 2010, plaintiff's father completed a Third Party Function Report regarding
14   plaintiff's limitations [AR at 209-15] and indicated that plaintiff does not do house or yard work
15   because "he think[s] he's better than that," and does not drive because he "doesn't want to."  [Id.
16   at 211.]  He also stated that plaintiff does not shop "at all," and that plaintiff is "afraid to go
17   anywhere alone," that plaintiff "blows up" in response to stress, and that plaintiff's ADHD has
18   affected his memory, concentration, and comprehension.  [Id. at 212-14.]

19        In her decision, the ALJ rejected plaintiff's mother's allegations as "inconsistent with the
20   other records," including plaintiff's own statements and testimony.  [AR at 21.]  The ALJ also
21   discounted the statements of both plaintiff's parents on the basis that they "are inconsistent with
22   the preponderance of the clinical or diagnostic medical evidence, and the opinions and
23   observations by medical doctors in this case."  [Id.]  Lastly, the ALJ found that "by virtue of the
24   relationship as the parents of [plaintiff]," their statements are biased in plaintiff's favor and as his
25   "sole support," his parents "have a financial interest in seeing [plaintiff] receive benefits."  [Id.]

26        The ALJ provided germane reasons for rejecting the statements and testimony from
27   plaintiff's mother and father.  In particular, the ALJ noted inconsistencies between plaintiff's
28   mother's assertion about plaintiff's stated use of methamphetamine and the record establishing

1   plaintiff's use in 2006.  [AR at 21; <u>see</u> <u>also</u> <u>id.</u> at 420-22 (treatment note that a "friend introduced

2   [plaintiff] to speed 3 days" earlier, and that plaintiff has used "speed" "since [he was a] kid"), 459,

3   475-76 (treatment notes from 2006 of methamphetamine abuse "two months" earlier, and use of

4   methamphetamine once at age 12).]  Additionally, with regard to both parents' allegations, the ALJ

5   noted that plaintiff's mental status examinations in 2009 and 2010, when he was compliant with

6   medications, were "significantly improved," and that plaintiff "acknowledged the medications were

7   effective in controlling his anger when he was compliant." [<u>Id.</u> at 22, 316-25.]  Finally, while it may

8   have been improper for the ALJ to discount plaintiff's parents' allegations on the grounds that they

9   are biased because they are his family members and they stand to gain financially should the

10   plaintiff be found disabled (<u>see</u> <u>Smolen</u>, 80 F.3d at 1289; <u>Regennitter</u>, 166 F.3d at 1298; <u>Johnson</u>

11   <u>v. Astrue</u>, 2008 WL 4553141, at *6 (C.D. Cal. Oct. 9, 2008) ("the Ninth Circuit has consistently

12   held that bias cannot be presumed from a familial relationship")), because the ALJ provided

13   additional and valid reasons germane to each witness for discrediting their testimony, any error

14   was harmless.[6]  <u>See</u> <u>Stout</u>, 454 F.3d at 1054-55 (finding harmless error where the ALJ "provided

15   numerous other record-supported reasons for discrediting the claimant's testimony," such that "the

16   ALJ's error did not materially impact his decision"); <u>Burch v. Barnhart</u>, 400 F.3d 676 (9th Cir. 2005)

17   (holding that an ALJ's decision will not be reversed for errors that are harmless).

18        In short, the ALJ's rejection of plaintiff's parents' statements and testimony is supported by

19   substantial evidence and remand is not warranted on this claim.

20   /

21   /

22   /

23   /

24   /

25

26       [6]   The Court notes that, to the extent plaintiff's father states that plaintiff does not do house

27   or yard work because "he think[s] he's better than that," and does not drive because he "doesn't

28   want to" [AR at 211], plaintiff's father's statements actually <u>support</u> the ALJ's decision, as they are
    inconsistent with the reasons for the limitations asserted by plaintiff.

## VI.

### CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that: (1) plaintiff's request for reversal, or in the alternative, remand, is **denied**; (2) the decision of the Commissioner is **affirmed**; and (3) the Clerk of the Court shall serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: October 23, 2013

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE